# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information Associated with one Hotmail account<br>identified by user amreid21@hotmail.com, which is<br>stored at premises controlled by Microsoft Corporation | )<br>)<br>)<br>)<br>)<br>) |

Case No.  19-sc-1548

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A

located in the _____Redmond_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 875(c) | "Interstate Transmission of Threats in Interstate Commerce" |
| 18 U.S.C. Section 844(e) | "Willfully Making a Threat" |

The application is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Kelli D. Johnson, Special Agent-NCIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____07/25/2019_____

_____
*Judge's signature*

City and state:  Washington, DC

Deborah A. Robinson, Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   19-sc-1548 |
| Information Associated with one Hotmail account identified by user amreid21@hotmail.com, which is stored at premises controlled by Microsoft Corporation | ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Redmond _____ District of _____ Washington _____
*(identify the person or describe the property to be searched and give its location):*

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 7, 2019 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Deborah A. Robinson _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____ 07/25/2019 3:00 pm _____        _____
                                                                                                              *Judge's signature*

City and state:   _____ Washington, DC _____        Deborah A. Robinson, Magistrate Judge
                                                                                                *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>   19-sc-1548 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Microsoft Corporation account identified by amreid21@hotmail.com and which is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company that accepts service of legal process at One Microsoft Way, Redmond, Washington  98052.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.     Information to be disclosed by Microsoft Corporation ("PROVIDER") to
facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A:

a.     For the time period January 1, 2019, to the present: The contents of all

communications and related transactional records for all PROVIDER services used by an Account

subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo

sharing or storage services, remote computing services, instant messaging or chat services, voice

call services, or remote computing services, including but not limited to incoming, outgoing, and

draft e-mails, messages, calls, chats, and other electronic communications; attachments to

communications (including native files); source and destination addresses and header or routing

information for each communication (including originating IP addresses of e-mails); the date, size,

and length of each communication; and any user or device identifiers linked to each

communication (including cookies);[3]

---

[3]     Here, PROVIDER's other services include electronic communication and remote
computing services such as Skype (voice calls, video calls, and SMS text messaging), Outlook
Calendar (calendar and task), Office Online (cloud computing services for word processing, data
processing, and presentations); OneDrive (online file storage); web browsing and search tools such
as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers); Bing
Maps (maps with driving directions and local business search) and other location services; online

a. For the time period January 1, 2019, to the present: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

b. For the time period January 1, 2019, to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

c. For the time period January 1, 2019, to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications). Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

d.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

e.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

f.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts)

ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

g.      All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

h.      For the time period January 1, 2019, to the present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

i.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

Within seven days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

**SA Kelli Johnson**
**Naval Criminal Investigative Service, Washington Field Office**
**2713 Mitscher Road, SW, Building 168, Suite 200**
**Washington, D.C. 20373**

II.     **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 875(c) and 844(e), as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning communications and/or threats regarding, about and/or to Rebecca Snyder, Rebecca, Alex, Brett, Andrew, Ashley, or any other government/military employee and/or official, and matters relating to the Reid's court martials, threats, threats to military and/or government employees

and officials, preparatory steps taken in furtherance of the scheme, including records that help reveal their whereabouts.

**III.         Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 875(c)** | **SC No. _19-sc-1548_____** |

*Reference:      USAO Ref. #2019R01331; Subject Account: amreid21@hotmail.com*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Kelli Johnson, Special Agent (SA) with the Naval Criminal Investigative Service, Washington Field Office, Washington, D.C., being duly sworn, deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with one account – that is, amreid21@hotmail.com – which is stored at premises controlled by Microsoft Corporation ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at / which accepts service at One Microsoft Way, Redmond, Washington 98052.   The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information

to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Naval Criminal Investigative Service ("NCIS"). I have been working with NCIS since October 1, 2018.  Before arriving to the Washington, D.C. Field Office, I attended training at the Federal Law Enforcement Training Center, Glynco, GA.  I completed the Criminal Investigation Training Program and the Special Agent Basic Training Program.  I received training in conducting investigations, interviewing, legal, cyber, physical evidence, firearms, and tactics.  As a NCIS special agent, my responsibilities include investigating criminal matters/violations of the Uniform Code of Military Justice and United States Code including violations of 18 U.S.C. § 875(c) (Interstate Communications of Threats) and 18 U.S.C. § 844 (e) (Telephonic Threats).  Prior to joining NCIS, I worked for the Federal Bureau of Prisons for three years as a Correctional Officer. My education includes a Masters of Arts in Criminal Justice and a Bachelor of Science in Criminology and Criminal Justice.  I have training and experience in the enforcement of criminal statutes within the United States Code, including the preparation, presentation, and service of arrest and search warrants.  I am currently assigned to General Crimes and I have received basic training in criminal schemes perpetrated via the internet.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of (1) Interstate Transmission of Threats in Interstate Commerce), in violation of 18 U.S.C. § 875(c), and (2) Willfully Making a Threat, in violation of 18 U.S.C. § 844(e), have been committed by Anthony M. Reid ("Reid").  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

6.      On January 30, 2012, Reid joined the United States Marine Corps.  On May 19, 2017, at a Special Court Martial and pursuant to a Pre-trial Agreement, Reid pled guilty to an Article 128 violation, Assault by Battery, in violation of the Uniformed Code of Military Justice ("UCMJ").  As a result, he received a Bad Conduct Discharge, was ordered to forfeit $1066 for 3 months, and was sentenced to confinement for 90 days.

7.      On or about January 28, 2019, Reid called Rebecca Snyder, Acting Appellate Director of the Navy-Marine Corps Appellate Division of the Office of the Judge Advocate General, U.S. Navy, at the Navy Yard in Washington, D.C.  Reid called Ms. Snyder at her

job regarding his criminal appeal.   During that telephone conversation, Reid identified himself as "Anthony Reid" and spoke with Ms. Snyder about his appeal.   That same day, Reid called back Ms. Snyder, said that he was going to file a complaint with the Inspector General, and would "bring down the system."   Ms. Snyder referred Reid to a Lieutenant Commander for further assistance.

8.      On May 6, 2019, Reid called Ms. Snyder multiple times at her job.   Reid called from telephone number (518) 528-4264.   During the first telephone conversation, Reid was furious and said that he was framed (referring to his conviction).   Ms. Snyder tried to calm down Reid but was unable to do so.   Reid wanted the Secretary of the Navy's contact information and was angry that Ms. Snyder did not have it readily available to provide. Ultimately, Ms. Snyder hung up on Reid because she could not have a productive conversation with him.   That telephone conversation was not recorded.

9.      During the second telephone conversation that same day, Reid was cursing and yelling at Ms. Snyder and told her "I am coming after you" and "you are going to pay for what you did."   Reid also said that the first law enforcement officer to come into contact with him will be a martyr.   That telephone conversation was not recorded.   Thereafter, that same day Reid called Ms. Snyder at least four more times.   Ms. Snyder did not answer those telephone calls because she recognized the telephone number that Reid had used to call her earlier that day.

10.      Also on May 6, 2019, Reid left a voice mail message on Ms. Snyder's work telephone.   Law enforcement obtained a copy of that voice mail message.   Before the message is played, the recording states "voice call from extension 518-528-4264."   During that voice mail message, a male voice said, "I'm waiting for you to report me [sic], go ahead,

go ahead and report those threats that I communicated because I have some that were communicated to me that I would like people to know about."  The male also said that he had already posted the emails on line.

> Also on May 6, 2019, Reid sent several emails to Ms. Snyder's work email address. For all of Reid's emails, his name "Anthony Reid" and email address "amreid21@hotmail.com" were included in the "From" category.  On May 6, 2019, at approximately 10:23 a.m., Reid sent the following email to Ms. Snyder: Your bosses' professional POC, give it to me now!  And you also need to tell me who their boss is and that person's so when I figure out that you're just stalling, I can move on to the next law breaking terrorist rogue commander.
>
>
> Additionally, you need to be working around the clock to find out how I'm going to report you to SECNAV.
>
> Best Regards
>
> A.M. Reid

11.     At Approximately 10:39 a.m. that same morning, Ms. Snyder sent a reply email to Reid stating that she had copied her supervisor and stated his name.  Later that same morning at approximately 10:51 a.m., Reid sent an email to the complaining witness that stated:

> You made so many excuses for why Jacque has such a delay in communication but you don't have any excuses so why am I still waiting for your bullshit reply?  Also could you go ahead a forward your complaints to the appropriate authority.  You did communicate to me on the phone that you feel threatened by me.  And you should.
>
> You have served beyond your usefulness lol.
>
> A.M. Reid

12.     At approximately 11:37 a.m. that same day, Reid sent the following email to Ms. Snyder:

5

Lol another Colonel huh?  You people seem to have trouble reaching someone who wears stars.  I don't care about Col. [name redacted]. But give me his bosses' poc tho.  No 0-6 could ever be the final over all approval authority.

I'm learning a lot about corruption from you.  Anytime I am referred to someone lower than a General then I won't accept what is being said at face value.  I'm sure there are generals in your office which I why you people are off the meter right now with this bullshit you are currently on.

I hope you get hit by a car on your way home today. I hope you don't make it. Lol. I hope you rip your pants when you sit down. I hope someone puts a thumb tack in that same chair. I hope you spill hot coffee on yourself. I hope you do your job with integrity and honesty. I hope you believe in the navy's core values. I hope you believe in the U.S. Constitution. I hope you have faith in the justice system. I hope you believe in fairness and equality. I hope you know you suck. I hope you step in dog shit. I hope someone rings your doorbell and run. I hope your next delivery from amazon comes a day late. I hope you get trapped in a corner with an angry feral cat. Avoid zoos too, because I hope you fall into a gorilla enclosure and get fucked up, that shit would be funny AF my guy. I hope these emails get you all fired. I hope you suffer worse than i have. I hope you'll find this funny someday. I hope you don't take this seriously like you don't take your responsibilities and obligations seriously.

I hope you have a nice day.

And I also hope someone fucks it up lol.

Best Regards

A.M. Reid

13.    At approximately 12:37 p.m. that day, Reid sent an email to Ms. Snyder that contained a screenshot of the internet home page of the U.S. Navy Judge Advocate General's Corps.  Circled in red was the division where Ms. Snyder works.  Also on that home page were the mailing address and telephone numbers for Ms. Snyder's employer.  Your affiant believes that Reid was informing Ms. Snyder that he knew where she worked.  That same afternoon at

approximately 1:25 p.m., Reid sent another email to Ms. Snyder that included the following statements:

> No reply?  What's wrong?  Did I say something that hurted your tiny feelings?  Lol I've decided that you're going to be contacted by me for the rest of your natural existence lol.  This is fun to me.  Since I can go to college or work, I will bother you instead college girl.
>
> So how do you feel about my language now?  Is it threatening yet?  Do you feel threatened by me?  Are you feeling unsafe lol?  Do you feel secure in your little standard issue office?
>
> I don't feel safe at all.  I feel very threatened by your action and or lack of.  I don't feel secure anywhere.  So you better pick up your phone every day that why I can feel somewhat safe knowing that you are not in New York.
>
> Lmfao "threatening language"
>
> You're a big pussy lol. A real genuine coward.  I'm glad this is going to your .mil account.  You can look at this.

Reid then included an email dated September 7, 2016, that he had sent to another person in the Marine Corps.  That email was from "Reid LCpl Anthony M <anthony.reid@usmc.mil>.  In that September 7, 2016, email Reid identified himself as "Pvt Reid," he discussed a general court marshal, and that he was told that he was going back to Okinawa for what he thought may be another scheduled Article 32.  Reid further stated in the September 7, 2016, email that he was resending the email from his "personal," which was a reference to his personal email account.  Also, the Cc: category listed the email address "amreid21@hotmail.com" - the same email account from which Reid was sending emails to the complaining witness.

14.     Later that same afternoon, at approximately 4:53 p.m., Reid sent another email to the complaining witness that stated in relevant part,

How's life? Do you like being able to breathe? Do you like being able to live? Do you like not being fucked with?  Do you guys hug your family after a long day of being a scumbag?  I don't hug my family.  They all left me because they believe in. . . .

\* \* \* \*

I hope you all have people counting on your ability to be employed and live a healthy life. I'm going to fuck that all up lmao! You all better act fast because I promise you that this will not be an issue in my life before 2020 gets here. Not fucking around. One way or another, I will eliminate you all from my life this could have been handled at the Lowe's level.  My CO could have disposed of those charges is he had done his job.  So fuck y'all.  Please report my "threatening language" like you said you were.  But not to another one of your but-buddies.  Report me to the next highest authority.

So let's see. Hmm after JAG of the navy there is ummm. . . . oh SECNAV.

You people are basically terrorist, you understand that?  This is terrorism.  Your actions destabilize Government continuity and efficiency.  And you wear the same uniform as I, that make you all an inside threat.

A.M. Reid

In one of the emails that Reid had sent to Ms. Snyder, he included a written memorandum that was on United States Marine Corps letterhead that was addressed to him while he was in the Marine Corps.

15.     Later that same day, at approximately 4:43 p.m., Reid emailed his Facebook link to the complaining witness.  During the investigation, law enforcement reviewed the content of Reid's Facebook page.  On May 5, 2019, at 5:55 p.m., a post was on Reid's Facebook account that read:

How does one gain access to the dark web?

> Google is useless… too heavily sanctioned for me to search for
> simple things such as; optics opposite of inferred.
>
> This is supposed to be a free market so finding specs on building
> UV optics shouldn't be difficult when the market for inferred optics
> is so vast.

In this Facebook post, Reid may have been referring to building a device to enhance weapon

capabilities.

16.    On May 6, 2019, the following message was posted on Reid's Facebook account:

> They are running from me.  I called Rebecca Snyder just now and
> she said to me that all of the concerns that I've presented to her were
> vague and unsubstantiated and does not warrant reopening my case!
>
> VAGUE?!  Are you deadass my nigga!  She hung up on me before
> I was actually able to threaten her.  She deserves to die, a long with
> everyone else responsible for my situation.  Clearly they have
> figured out how to avoid prison but I'm sure they can still be killed.
> This power they rely on sooo much doesn't grant immortality or
> invincibility lol. I'm done talking.  If I see someone come out of a
> government vehicle and into my apartment building, that person or
> people are now very likely to come under attack.  This is what I've
> been waiting for.
>
> The first person to call my bluff is the first martyr.  Nothing is taken
> seriously until someone dies.

That same day at approximately 3:03 p.m., the following message was posted on Reid's

Facebook account:

> Lol last week I had 40 Friends now I'm down to 36.  It was 37 but I
> just deleted someone for never replying to my messages.
>
> So if you don't really care about me or my posts then just begone,
> I'm about to be homeless now so my rage and anger only increases
> from here.

17.    Later that same day at approximately 3:45 p.m., the following post was on Reid's

Facebook account:

> Lmfao come for me then!  Just keep in mind, I didn't strike first.
> Everything I'm doing is to protect myself.  Self defense is defense
> of self.  I'm not being defended by the DOD, I'm being attached.
> Time to strike back.  Doesn't seem like they're interested in justice
> to me so I guess this is just a vendetta.

A few minutes later, at 3:49 p.m., the following post was on Reid's Facebook account:

> This shit worries me everyday because these individuals know that
> I'm not going to let this go.
>
> They have already crossed the planet to keep these lies quiet and
> here I am home side, and they're still keeping it up.
>
> What's the point in leaving it to MY imagination to wonder how far
> these people will go to cover their ass. That is very dangerous. . . .

18.     Later that evening, at approximately 8:13 p.m., the following message was posted

on Reid's Facebook account:

> I promise you that won't make anyone an accessory but this is
> everyone's one and only chance to NOT be associated with me
> because I am going to hurt people. It's not an "if" deal. It's "when"
> type of thing. So right now is your only chance to downgrade from
> friends to acquaintance or anything lesser. Any from here on out,
> anyone who suggests I get over the past is a target to me. You must
> be friend of Rebecca or Ashley or Alex or Brett or Andrew. There's
> only a short 13 names on my kill list. Don't fuck around and end up
> as a bench warmer on my roster.

Your affiant believes that Ms. Snyder's first name, Rebecca, is the "Rebecca" listed in this post.

19.     On May 9, 2019, the following message was posted on Reid's Facebook account:

> None of my "threats" are true, I posted them here to give these
> dickheads the support the need to report me to the authorities.  And
> the did not.  Funny how one white girl says I touched her, I'm on
> jail in hours. One white But when it comes to me just trying to get
> my car back, all the white people tell me "no".  Like how did it even
> come to this?  All I ever really did was work and play my PS4.

Also on Reid's Facebook account was a photograph that included Reid who was dressed in military clothing.

20.     During the investigation, law enforcement obtained the telephone number that Reid had used to call the complaining witness.  Investigations conducted at that time revealed that it was a cellular telephone with no subscriber information and that the service provider was Sprint. With the assistance of the Metropolitan Police Department of the District of Columbia, on May 8, 2019, law enforcement began to track that cellular telephone number on an emergency basis. Geolocation data revealed that during the week of May 6, 2019, that cellular telephone was in the Bronx, New York.

21.     On May 10, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia authorized the issuance of arrest warrant for Reid and a Criminal Complaint that charged one count of Transmitting Threats in Interstate Commerce, in violation of 18 U.S.C. § 875(c).    On May 11, 2019, a special agent with the NCIS New York Field Office and other members of law enforcement went to an apartment in the Bronx, New York, where they believed Reid resided, to execute the arrest warrant for him.  Reid was not at home at that time. However, law enforcement spoke with two family members of Reid who lived in the apartment and confirmed that the Reid lived there.

22.     On May 13, 2019, law enforcement returned to the apartment where Reid lived in the Bronx, New York, to execute the arrest warrant for him.  Law enforcement knocked on the apartment door and no one answered.  Law enforcement rang the doorbell.  Reid opened a window to the outside walkway and could be seen by law enforcement.  The NCIS special agent previously had viewed a photograph of Reid, observed him, and confirmed that it was Reid. The NCIS special agent informed Reid that they had a warrant for his arrest, asked whether he was Anthony Reid,

and showed him a copy of the arrest warrant. Reid confirmed his identity, said that he did not believe that the warrant was legitimate, and that he was not going to obey it. Law enforcement again showed Reid a copy of the arrest warrant. The NCIS special agent heard someone putting heavy things down in front of the apartment's front door in what sounded like an effort to barricade the apartment front door to prevent entry. Members of law enforcement continued to talk to Reid who remained inside the apartment. Reid refused to open the apartment front door and was not cooperative. After law enforcement made numerous attempts to have Reid open the apartment door, due to safety concerns for one of Reid's family members believed to have been inside the apartment at that time, law enforcement breached the apartment front door. Upon entry into the apartment law enforcement confirmed that Reid had barricaded the apartment front door. Reid was taken into custody and arrested.

23.     While inside the apartment law enforcement conducted a security sweep and observed in plain view in an opened bag in Reid's bedroom what appeared to be an AR-15 type rifle with a collapsible stock. On May 13, 2019, the Honorable Stewart D. Aaron of the United States District Court for the Southern District of New York authorized a search warrant for the apartment where Reid lived in the Bronx, New York. During the execution of the search warrant, law enforcement recovered several items, including the AR-15 type rifle with a collapsible stock that had what appeared to be an attached scope. No ammunition was recovered.

24.     Reid used the email address, amreid21@hotmail.com. Reid also used Sprint cellular telephone number (518) 528-4264 to contact Ms. Snyder. Additionally, he sent to Ms. Snyder the following link to his Facebook account:

https://www.facebook.com/100031726822319/posts/135596617507898?s=100031726822319&v=i&sfns=mo.

25.     Based upon the investigation conducted to date, the names of the individuals on Reid's kill list have been connected to his court martial proceedings, appeal process/proceedings, or his military service.

26.     On May 14, 2019, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to amreid21@hotmail.com.

**BACKGROUND CONCERNING PROVIDER'S ACCOUNTS**

27.     PROVIDER is the provider of the internet-based account(s) identified by amreid21@hotmail.com

28.     PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online.  PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

29.     Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website.  During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.  PROVIDER typically does not verify subscriber names.  However, PROVIDER does verify the e-mail address or phone number provided.

30.      Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic

address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[1]

31.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

32.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing, voice calls, video chats, and SMS text messaging.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it

---

[1]     Here, PROVIDER's other services include electronic communication and remote computing services such as Skype (voice calls, video calls, and SMS text messaging), Outlook Calendar (calendar and task), Office Online (cloud computing services for word processing, data processing, and presentations); OneDrive (online file storage); web browsing and search tools such as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers); Bing Maps (maps with driving directions and local business search) and other location services; online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications). Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

33.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

34.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as

laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

35.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.  This application is associated with the subscriber's PROVIDER account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in

turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider

needs to send notifications to the user's device, it sends both the Push Token and the payload

associated with the notification (*i.e.*, the substance of what needs to be sent by the application to

the device).  To ensure this process works, Push Tokens associated with a subscriber's account are

stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain

useful information that may help to identify the specific device(s) used by a particular subscriber

to access the subscriber's PROVIDER account via the mobile application.

36.     Based on my training and experience, I know that providers such as PROVIDER

use cookies and similar technologies to track users visiting PROVIDER's webpages and using its

products and services.  Basically, a "cookie" is a small file containing a string of characters that a

website attempts to place onto a user's computer.  When that computer visits again, the website

will recognize the cookie and thereby identify the same user who visited before.  This sort of

technology can be used to track users across multiple websites and online services belonging to

PROVIDER.  More sophisticated cookie technology can be used to identify users across devices

and web browsers.  From training and experience, I know that cookies and similar technology used

by providers such as PROVIDER may constitute evidence of the criminal activity under

investigation.  By linking various accounts, devices, and online activity to the same user or users,

cookies and linked information can help identify who was using a PROVIDER account and

determine the scope of criminal activity.

37.     Based on my training and experience, I know that PROVIDER maintains records

that can link different PROVIDER accounts to one another, by virtue of common identifiers, such

as common e-mail addresses, common telephone numbers, common device identifiers, common

computer cookies, and common names or addresses, that can show a single person, or single group

of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

38.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

39.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

40.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDER can show how and when the account was accessed or used.  For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail).  Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime),

or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[2]

41.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis,

---

[2]     At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## **CONCLUSION**

42.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Kelli Johnson, Special Agent
NCIS

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July 25, 2019.

_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE